IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  06-cv-01665-PSF-PAC

COLORADO CROSS DISABILITY COALITION, d/b/a Center for Rights of Parents with
Disabilities, a Colorado corporation;
GINNY L. LOCKWOOD; and
JENNIFER ANN PFAU,

      Plaintiff(s),

v.

COHEN & WOMACK, P.C.,

      Defendant(s).

---

## MINUTE ORDER

---

**ORDER ENTERED BY MAGISTRATE JUDGE PATRICIA A. COAN**

      IT IS HEREBY **ORDERED** that the Motion for Leave to File Amended Complaint
[filed September 7, 2006; Doc. No. 4] is **GRANTED.**  The attached Amended Complaint
is accepted for filing this date.

Dated:  September 8, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01665-PSF-PAC

COLORADO CROSS-DISABILITY COALITION, d/b/a CENTER FOR RIGHTS OF
    PARENTS WITH DISABILITIES, a Colorado Corporation,
GINNY L. LOCKWOOD,
JENNIFER ANN PFAU,
ANNETTE A. GUERRERO, and
MANUEL OLIVAS,

    Plaintiffs,

v.

COHEN & WOMACK, P.C.,

    Defendant.

---

## AMENDED COMPLAINT

---

Plaintiffs Colorado Cross-Disability Coalition, d/b/a Center for Rights of Parents with

Disabilities and Ginny L. Lockwood, Jennifer Ann Pfau, Annette Guerrero, and Manuel Olivas,

by and through their attorneys, Carrie Ann Lucas, Equal Justice Works Fellow, and Kevin W.

Williams, Legal Program Director, of the Colorado Cross-Disability Coalition, hereby bring this

Complaint against Cohen & Womack, M.D., P.C.

### Introduction

1.      Sixteen years after the Americans with Disabilities Act was passed, Cohen &

Womack, M.D., P.C. refuses to provide sign language interpreters to deaf and hard of hearing

patients, depriving them of effective communication during medical appointments.

2.      On July 12, 1990, Congress enacted the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., establishing the most important civil rights law for people with disabilities in our country's history.

3.      Among the primary purposes of the ADA is ensuring that individuals who are deaf or hard of hearing receive interpreter services and other auxiliary aids and services when communicating with doctors to ensure effective communication.

4.      Effective communication with deaf or hard of hearing individuals is essential to provide quality health care. Critical medical information is communicated at many points, such as during consultations, when explaining medical procedures, when obtaining informed consent, and when giving instructions for care at home.  .

5.      Despite this, medical providers regularly refuse to provide interpreters and other auxiliary aids for deaf and hard of hearing individuals.  This results in deaf and hard of hearing individuals receiving substandard medical care, if they are able to access the care at all.

### Jurisdiction and Venue

6.      This Court has jurisdiction over the federal claim in this action pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper within this District pursuant to 28 U.S.C. § 1391.

### Parties

8.      Plaintiff Colorado Cross-Disability Coalition, d/b/a Center for Rights of Parents with Disabilities is ("CRPD") is a Colorado non-profit corporation whose members are persons with disabilities and their nondisabled allies.

-2-

9.      Plaintiff Ginny Lockwood is and was at all times material hereto a resident of Colorado residing at 16400 Umpire St., Hudson, Colorado 80642. Ms. Lockwood is substantially limited in several major life activities, including hearing. Ginny Lockwood is a CCDC member.

10.     Plaintiff Jennifer Ann Pfau is and was at all times material hereto a resident of Colorado residing at 1319 W. 133rd Circle, Westminster, Colorado 80234. Ms. Pfau is substantially limited in the major life activity of hearing. Jennifer Ann Pfau is a CCDC member.

11.     Plaintiff Annette A. Guerrero is and was at all times material hereto a resident of Colorado residing at 1614 Iris Street, # 97, Lakewood, Colorado 80215. Ms. Guerrero is substantially limited in the major life activity of hearing. Annette A. Guerrero is a CCDC member.

12.     Plaintiff Manuel Olivas is and was at all times material hereto a resident of Colorado residing at 1614 Iris Street, # 97, Lakewood, CO 80215. Mr. Olivas is substantially limited in the major life activity of hearing. Manuel Olivas is a CCDC member.

13.     Defendant Cohen & Womack, M.D., P.C. ("Cohen & Womack") is a Colorado Corporation with its principal place of business at 255 Union Blvd., Suite 200, Lakewood, Colorado 80228. Cohen & Womack operates under several trade names, including Contemporary Healthcare for Women, Red Rocks Women's Care, Red Rocks OB GYN, Red Rocks Obstetrics and Gynecology, and Red Rocks OB-GYN. Defendant owns and operates an obstetrics and gynecology medical practice in Colorado. On information and belief, Defendant receives federal financial assistance.

-3-

## **General Allegations**

14.     Plaintiff Ginny Lockwood is deaf.  She cannot hear voices and cannot communicate verbally.  Her primary mode of communication is American Sign Language.

15.     Like many individuals who are deaf since childhood, Ms. Lockwood does not read or write with fluency. She considers American Sign Language, not English, to be her native language.

16.     In order to communicate effectively in situations involving medical advice, diagnosis, procedures and decision making, Ms. Lockwood requires the services of a qualified sign language interpreter.

17.     Ms. Lockwood's husband, Kenny Lockwood, is not deaf and he is not a qualified sign language interpreter.  He is unable to communicate effectively with Ms. Lockwood regarding medical terminology and issues.

18.     In March, 2004, Ms. Lockwood began seeing Dr. Robert Alan Konigsberg, D.O. at Contemporary OBGYN for treatment of pelvic pain.  Ms. Lockwood was treated by Dr. Konigsberg at Contemporary OBGYN until January, 2005 when she was told to schedule a follow-up appointment in six months.

19.     In July, 2005, Ms. Lockwood contacted Contemporary OBGYN to schedule her follow-up appointment with Dr. Konigsberg, but was told he no longer worked there, and that he was at Cohen & Womack.  Ms. Lockwood then called Cohen & Womack and scheduled an appointment for August, 2005.

20.     When Ms. Lockwood scheduled her appointment, she told the woman who was assisting her that she needed a sign language interpreter. The woman told Ms. Lockwood that she would find out about the interpreter.

21.     On or about August 22, 2005, Ms. Lockwood attended her follow-up appointment with Dr. Konigsberg at Cohen & Womack. There was no interpreter and Dr. Konigsberg asked Ms. Lockwood where her husband was. Ms. Lockwood explained her husband was at work. Dr. Konigsberg looked unhappy. Dr. Konigsberg and Ms. Lockwood exchanged some notes in an attempt to communicate. Ms. Lockwood was very frustrated, and she was unable to explain how her medical condition had deteriorated since her last visit with Dr. Konigsberg, because she does not read or write with fluency. Dr. Konigsberg gave Ms. Lockwood a pain chart to fill out.

22.     Ms. Lockwood returned for a follow-up appointment on or about October 26, 2005. Despite Ms. Lockwood having requested a sign language interpreter, Cohen & Womack did not provide an interpreter. Again Dr. Konigsberg asked Ms. Lockwood where her husband was. Ms. Lockwood again explained her husband was at work, and that she should have been provided with an interpreter. Dr. Konigsberg and Ms. Lockwood wrote notes in an attempt to communicate. Dr. Konigsberg told Ms. Lockwood she needed surgery and an ultrasound. Ms. Lockwood was unable to understand why she needed surgery, and was unable to ask questions or explain her medical concerns.

23.     After the October appointment, Cohen & Womack called Ms. Lockwood's husband Kenny, rather than calling her, to schedule her pre-surgical appointment and surgery date. Cohen & Womack told Mr. Lockwood that Ms. Lockwood would be required to watch a

video in preparation for her surgery.  Ms. Lockwood's pre-surgical appointment was scheduled

for November 17, 2005.

24.     Ms. Lockwood called Cohen & Womack to ask if the video had closed

captioning.  The woman Ms. Lockwood spoke with told her that the video was not captioned,

and that Ms. Lockwood needed to bring her husband to interpret.  Ms. Lockwood explained to

the woman that her husband is not an interpreter, and that she needs a qualified interpreter to

watch the video.  The woman on the phone told Ms. Lockwood that she would discuss the issue

with the doctor and call Ms. Lockwood back.  Ms. Lockwood never received a return phone call.

25.     On or about November 9, 2006, one of Ms. Lockwood's college interpreters

called Cohen & Womack on Ms. Lockwood's behalf, and left a message for Barbara, requesting

a sign language interpreter.  Neither the interpreter nor Ms. Lockwood received a return call.

26.     On or about November 14, 2005, Ms. Lockwood left another message for

Barbara, requesting an interpreter.  On or about November 15, 2005, Barbara called back, and

informed Ms. Lockwood that Cohen & Womack would not be providing an interpreter, and that

Ms. Lockwood would need to bring her own interpreter if she needed one.

27.     Ms. Lockwood was extremely frustrated, but decided to bring her own interpreter

in order to ask questions and understand the doctor in preparation for surgery.  She contacted 24

Hour Sign Language Services to arrange for an interpreter.  The agency's owner then faxed

portions of the ADA and information about the requirement to provide interpreters to Cohen &

Womack in an attempt to get them to provide an interpreter. 24 Hour Sign Language Services did not receive a response from Cohen & Womack.

28.     On or about November 16, 2005, Ms. Lockwood again called Cohen & Womack to again request an interpreter. Ms. Lockwood spoke to Rhonda who said Dr. Konigsberg stated that an interpreter was not needed and that Ms. Lockwood could write notes to communicate. Rhonda also told Ms. Lockwood that Cohen & Womack was unable to find an interpreter, although 24 Hour Sign Language Services had a qualified interpreter available. Ms. Lockwood persisted in requesting an interpreter, and Rhonda told Ms. Lockwood that she would have to speak to the office manager. Rhonda asked for Ms. Lockwood's phone number for the office manager to call back.

29.     A short time later the office manager, a woman named Tonya, called Ms. Lockwood and left a message. Ms. Lockwood immediately returned the call, and asked Tonya if she had received the facsimile about ADA requirements from 24 Hour Sign Language Services. Tonya confirmed that she had received it, but that Cohen & Womack would not be providing an interpreter. Ms. Lockwood explained it is unlawful to not provide an interpreter, and she told the office she expected to have an interpreter for her appointment the following day. Tonya then told Ms. Lockwood that she needed to find another doctor if she wanted a sign language interpreter. Ms. Lockwood became very upset and asked Tonya if she was telling Ms. Lockwood to find another doctor, and Tonya told her that was correct. Ms. Lockwood told her it was wrong and unfair, but Tonya said there was nothing they could do and ended the call.

30.     Ms. Lockwood then contacted 24 Hour Sign Language Services to arrange for an interpreter.

31.     On November 17, 2005, Ms. Lockwood, along with her husband and an interpreter arrived for her pre-surgical appointment.  Ms. Lockwood asked to speak with Tonya to confirm the office would not pay for an interpreter.  Tonya stated she would need to ask the doctor.  Ms. Lockwood was then asked to sign pre-surgical paperwork.  Ms. Lockwood asked to see Dr. Konigsberg first.  Ms. Lockwood was taken to Dr. Konigsberg's office to wait.

32.     When Dr. Konigsberg entered his office and saw that Ms. Lockwood had brought a sign language interpreter, he became very upset and stated that he would not pay for an interpreter.  Dr. Konigsberg stated he did not believe Ms. Lockwood needed an interpreter, and told her writing notes was acceptable.  Mr. and Ms. Lockwood explained that writing notes was not effective, and that she needed an interpreter to understand the video.  Dr. Konigsberg then said Ms. Lockwood did not need to watch the video, although office personnel told Ms. Lockwood the video was required before surgery.  Dr. Konigsberg then said he would not perform surgery on Ms. Lockwood because he stated she was an "angry patient."  Ms. Lockwood then asked Dr. Konigsberg to write his refusal to provide an interpreter.  Dr. Konigsberg then gave Ms. Lockwood a note that stated, "Patient was told that the office would not pay for an interpreter, but that she could provide one if she wanted."  Dr. Konigsberg wrote a similar note in Ms. Lockwood's chart.

33.     Despite the repeated requests for an interpreter for effective communication, Cohen & Womack never provided Ms. Lockwood with an interpreter.

-8-

34.     Upon information and belief, Cohen & Womack terminated its relationship with Ms. Lockwood because Ms. Lockwood insisted that Cohen & Womack accommodate her disability as required by federal law.

35.     Ms. Lockwood had great difficulty finding another gynecologist that would accept Medicaid and provide an interpreter. After many phone calls, Ms. Lockwood located a new doctor, but was unable to schedule an appointment until January 13, 2006. Ms. Lockwood was instructed to bring her medical records with her to her appointment.

36.     On or about December 22, 2005, Ms. Lockwood went to Cohen & Womack to sign papers to get copies of her medical record. Ms. Lockwood spoke with Luz, and was told it would take 10-15 days to receive her records. Ms. Lockwood never received her records.

37.     On January 13, 2006, Ms. Lockwood again called Cohen & Womack and spoke to Sarah. Sarah told Ms. Lockwood to have her new doctor contact the office and they would fax the records to the new doctor.

38.     Later that day, Ms. Lockwood's new physician at the University of Colorado Hospital requested Ms. Lockwood's records. On information and belief, Cohen & Womack refused to provide copies of Ms. Lockwood's records because Ms. Lockwood had contacted an attorney. After Ms. Lockwood's physician talked to the office, Cohen & Womack provided a few pages of Ms. Lockwood's records.

39.     As a result of Cohen & Womack's refusal to provide an interpreter, and refusal to treat her, Ms. Lockwood experienced continuing physical pain, disruption in medical care, and emotional distress.

-9-

40.     On May 3, 2006, CRPD representative, Andrew Montoya, called Cohen &

Womack to schedule a new patient appointment and to request a sign language interpreter.  He

first talked to a woman in scheduling who told him "we do not provide interpreters for the deaf,

our doctor will communicate by notes."

41.     On May 25, 2006, Mr. Montoya called back to ask about an interpreter again.  He

was transferred to Rhonda.  Rhonda stated that patients need to bring their own interpreter, or

bring a family member.  Mr. Montoya asked Rhonda to double check that is accurate, and

Rhonda told him that it is one of the rules set by the doctors.

42.     Jennifer Ann Pfau is deaf.  She cannot hear voices.  Her primary mode of

communication is American Sign Language.

43.     In order to communicate effectively in situations involving medical advice,

diagnosis, procedures and decision making, Ms. Pfau requires the services of a qualified sign

language interpreter.

44.     On July 24, 2006, Ms. Pfau contacted Cohen and Womack to schedule an

appointment.  Tonya, the Cohen and Womack scheduler, told Ms. Pfau that Cohen and Womack

has a policy that patients must bring their own interpreters, or write notes for communication.

When Ms. Pfau asked her to confirm that policy, Tonya asked Ms. Pfau to call back later.

45.     Several hours later Ms. Pfau called Cohen and Womack and again asked Tonya to

schedule an appointment and provide a sign language interpreter.  Ms. Pfau asked Tonya which

interpreting agency the office would be using.  Tonya told Ms. Pfau they would be using

Professional Sign Language Interpreters ("PSLI").  Ms. Pfau scheduled an appointment for

August 24, 2006.

-10-

46.     On August 21, 2006, Ms. Pfau received a phone message from Tonya at Cohen and Womack asking her to bring her own interpreter to her appointment on August 24, 2006. When Ms. Pfau called back, Tonya again asked her to bring her own interpreter or write notes to communicate with the doctor. Ms. Pfau explained writing notes does not provide effective communication, and that she was unable to provide her own interpreter. Tonya told Ms. Pfau that she had contacted PSLI, and that they had no interpreters for the entire week. Ms. Pfau rescheduled her appointment for September 18, 2006.

47.     Ms. Pfau then contacted PSLI to find out if they had received an interpreter request from Cohen and Womack. The scheduling coordinator told Ms. Pfau that Cohen and Womack had not contacted them, and they did have interpreters available for an appointment on August 24, 2006.

48.     After learning this, Ms. Pfau cancelled the rescheduled appointment with Cohen & Womack to schedule with another doctor where she is sure to receive an interpreter. Ms. Pfau would like to receive care from Cohen and Womack in the future.

49.     Annette A. Guerrero and her partner, Manuel Olivas, are deaf. Ms. Guerero and Mr. Olivas have three children, two of whom are also deaf.  Like many individuals who are deaf since childhood, Ms. Guerrero and Mr. Olivas do not read or write with fluency. American Sign Language, not English, is their native language. Ms. Guerrero is a Cohen & Womack patient.

50.     In November, 2005, after learning she was pregnant, Ms. Guerrero called Cohen & Womack to make an appointment for pre-natal care. Ms. Guerrero selected Cohen & Womack for her care because they were the only clinic that she could find that was near to her home that accepted new patients with Medicaid. Ms. Guerrero requested a sign language

-11-

interpreter, but after waiting on hold was told that Cohen & Womack does not provide interpreters. Ms. Guerrero was told to bring a family member to interpret.

51.     On or about December 7, 2005, Ms. Guerrero had her first appointment. She was accompanied by her partner, Mr. Olivas and her mother, Francis Guerrero who is hearing. Mrs. Guerrero is not a qualified interpreter, and unable to communicate effectively with Ms. Guerrero and Mr. Olivas regarding medical terminology and issues. Francis Guerrero explained to Cohen & Womack staff that they needed to provide a sign language interpreter for her daughter and Mr. Olivas. Mrs. Guerrero was told that she needed to come with her daughter to appointments to interpret.

52.     On or about January 4, 2006, Ms. Guerrero and Mr. Olivas attended an appointment at Cohen & Womack. Ms. Guerrero had requested an interpreter, but when she arrived at her appointment, she was not provided with an interpreter. Ms. Guerrero was forced to attempt to communicate via writing, but did not understand information about the progress of her pregnancy, the health of her baby or herself. The doctor did not attempt to write with Mr. Olivas at all.

53.     Ms. Guerrero and Mr. Olivas attended approximately fourteen other appointments at Cohen & Womack. Every time Ms. Guerrero asked for an interpreter, she was told to bring a family member to interpret. Ms. Guerrero was forced to attempt to communicate via writing, but did not understand information about the progress of her pregnancy, the health of her baby or herself. The doctors and staff did not attempt to write with Mr. Olivas at all.

54.     Because they were not provided with a sign language interpreter, Ms. Guerrero and Mr. Olivas remained ignorant about basic pregnancy progress throughout Ms. Guerrero's

-12-

pregnancy. They never knew Ms. Guerrero's fundal height, her weight, or results from ultrasounds and laboratory tests. Ms. Guerrero was required to go to a hospital for a "sugar test," but did not know why. It was not until she went to the hospital for the test, where she was provided with an interpreter, that she understood what the test was, and why she was being tested. Ms. Guerrero asked as many questions as she could during this test, but because the hospital did not have her chart, they were unable to answer most of her questions.

55.     During her pregnancy, Ms. Guerrero was diagnosed with gestational diabetes. Because she was not provided with a sign language interpreter, she was unable to understand how she was to treat and manage her condition because she could not discuss the condition with her doctors. Throughout the remainder of her pregnancy, Ms. Guerrero and Mr. Olivas worried about the impact this had on Ms. Guerrero's health. Ms. Guerrero had to learn about her condition from lay people because she was unable to discuss the condition with her doctors at Cohen & Womack.

56.     During one appointment, while having an ultrasound, the baby was not moving. The technicians and nurse performed several procedures on Ms. Guerrero in an attempt to get the baby to move. No Cohen & Womack employee explained what the problem was, or what the procedures they were doing were. Because she was not provided with a sign language interpreter, Ms. Guerrero was unable to ask questions, and she was unable to ask them to stop the procedure when it was painful.

57.     During one appointment, a nurse asked Ms. Guerrero's then three-year-old daughter to interpret information about the baby's heartbeat. Ms. Guerrero and Mr. Olivas were

upset that their toddler daughter was being asked to convey important medical information and the clinic would not provide an interpreter.

58.     At the end of her pregnancy, Ms. Guerrero's labor was induced.  Ms. Guerrero did not and does not know why this was necessary because she never had effective communication during visits at Cohen & Womack.

59.     At times Cohen & Womack staff made no attempts to provide effective communication.  At one appointment, Ms. Guerrero waited for over an hour for her appointment. After she saw many patients who had arrived after her go back for their appointments, Ms. Guerrero inquired about the wait.  Ms. Guerrero was told that the nurse had called her name several times, and when she didn't respond, they assumed she had left.

60.     On or about May 12, 2006, Ms. Guerrero was scheduled to see Dr. Jennifer Grube.  When Dr. Grube entered the exam room, she demanded to know why Ms. Guerrero had not brought her mother to interpret.  Ms. Guerrero explained that her mother had to work.  Dr. Grube left the room without examining her.  Eventually a nurse came and told Ms. Guerrero to schedule her next appointment, and Ms. Guerrero did not see any other doctor during that visit.

61.     Ms. Guerrero needed to schedule her six-week post-natal follow-up appointment after the birth of her son.  In addition to a follow-up examination, Ms. Guerrero  wanted to discuss birth control and other matters with the doctor.  Ms. Guerrero was deterred from scheduling that appointment because she knew that without an interpreter, she would be unable to discuss any of her concerns  with the doctor, or get answers to her questions.

62.     Ms. Guerrero would like to continue her care at Cohen & Womack if she knows they will provide a sign language interpreter for her appointments.

-14-

63.     Mr. Olivas would like to attend future appointments with his wife at Cohen &
Womack if he knows they will provide a sign language interpreter.

64.     The Cohen & Womack employees with whom Plaintiffs dealt were, at all times
relevant to this matter, acting within the scope of their employment for Defendant.

65.     On information and belief, Defendant receives federal financial assistance,
including Medicaid and Medicare payments.

66.     CRPD's purpose is to promote independence, self-reliance, and full participation
for people with all types of disabilities and to combat discrimination that impacts parenting for
parents with disabilities, through direct services, education, research and training.  As part of that
purpose, CRPD seeks to ensure that parents with disabilities have access to -- and do not
encounter discrimination in -- obtaining gynecological and obstetrical care.

67.     CRPD engages in extensive outreach as well as advocacy and educational efforts
to promote access for and combat discrimination against parents with disabilities.  This effort
and this purpose have been and continue to be adversely affected by Cohen & Womack's
violations of the Americans with Disabilities Act and Rehabilitation Act.

68.     Defendant's actions have caused and continue to cause distinct, palpable, and
perceptible injury to CRPD.  Those injuries include but are not limited to those described herein.

69.     CRPD has devoted resources, which could have been devoted to its other
outreach, advocacy, and educational efforts, to communicating with Defendant in an attempt to
secure interpreter services to open the door for other CRPD members to access gynecological
and obstetrical care.

-15-

70.    CRPD has devoted resources, which could have been devoted to its other outreach, advocacy, and educational efforts, to educate members and others who have been injured by Defendant's discrimination.

71.    Cohen & Womack's discrimination has been and continues to be a barrier to the full participation of persons with disabilities and, therefore, frustrates CRPD's ability to achieve full inclusion for persons with disabilities.  For example:

      a.    Cohen & Womack's discrimination, in and of itself, deprives disabled women who use Medicaid of one of the few practices that accept new Medicaid patients;

      b.    Cohen & Womack's actions send the message that such discrimination continues to be acceptable at this time and discourages parents with disabilities from seeking gynecological and obstetrical care and preventing women from undergoing routine gynecological care such as cancer screening;

72.    Cohen & Womack's discrimination has required and continues to require CRPD to make a greater effort -- and to allocate significant resources -- to educate the public that such discrimination is wrong and otherwise to counteract the adverse impact of such discrimination. This perceptibly impairs CRPD's counseling, advocacy, educational, and training missions.

73.    CRPD also has devoted and continues to devote resources -- including but not limited to those devoted to the present lawsuit -- to identifying and counteracting the sources of discrimination in the community, including that of Cohen & Womack.

-16-

74.     CRPD's injuries -- including, without limitation, those described herein -- are traceable to Cohen & Womack's discriminatory conduct alleged in this Complaint and will be redressed by the relief requested in it.

75.     CRPD's members include individuals who are deaf who require auxiliary aids and services for effective communication.

76.     CRPD's members have been injured and will continue to be injured by Defendant's discrimination described above.

77.     The elimination of discrimination, such as that of Defendant, and the integration of persons with disabilities into the community are at the core of CRPD's organizational purpose.

78.     The participation of individual CRPD members in the lawsuit is not required either to resolve the claims at issue or to formulate relief.

### Claim I: Violation of Title III of the Americans with Disabilities Act

79.     Plaintiffs reallege and incorporate by reference the allegations set forth in this Complaint as if fully set forth herein.

80.     Defendant owns and or operates a medical office and is therefore a place of public accommodation as defined in 42 U.S.C. § 12181(7)(F).

81.     Defendant has discriminated against Plaintiffs on the basis of disability, in violation of 42 U.S.C. § 12182. Defendant's discriminatory conduct includes but is not limited to:

    a.     Discriminatory exclusion from and/or denial of goods, services, facilities, privileges, advantages, accommodations, and/or opportunities;

-17-

    b.    provision of goods, services, facilities, privileges, advantages, and/or accommodations that are not equal to those afforded non-disabled individuals; and

    c.    a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.

82.    As such, Defendant discriminates and, in the absence of the injunction requested herein, will continue in the future to discriminate against Plaintiffs on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations and/or opportunities of its medical office in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181, et seq., and/or its implementing regulations.

83.    Plaintiffs and CRPD's members have been injured by Defendant's discrimination.

84.    Plaintiffs have been injured and aggrieved by, and will continue to be injured and aggrieved by, Defendant's discrimination.

## Claim II: Violation of Title IV of the Americans with Disabilities Act

85.    Plaintiffs reallege and incorporate by reference the allegations set forth in this Complaint as if fully set forth herein.

86.    Defendant discriminated against Plaintiff Lockwood because she opposed an act or practice made unlawful by the ADA in violation of 42 U.S.C. 12203(a).

87.     Plaintiffs have been injured and aggrieved by, and will continue to be injured and aggrieved by Defendant's discrimination.

### Claim III:  Violation of Section 504 of the Rehabilitation Act

88.     Plaintiffs reallege and incorporate by reference the allegations set forth in this Complaint as if fully set forth herein.

89.     Defendant receives federal financial assistance as that term is used in 29 U.S.C. § 794.

90.     Defendant has discriminated against Plaintiffs on the basis of disability in violation of 29 U.S.C. § 794 and its implementing regulations as more fully described above. Such discrimination includes but is not limited to failure to provide auxiliary aids and services, and retaliation for and/or coercion, intimidation, threats and/or interference with the exercise of Plaintiffs' rights under the Rehabilitation Act and its implementing regulations.

91.     Defendant has acted with deliberate indifference to the strong likelihood that pursuit of Defendant's questioned policies, and failure to provide auxiliary aids and services would likely result in a violation of federally protected rights.

92.     Plaintiffs have been injured and aggrieved by and will continue to be injured and aggrieved by Defendant's discrimination.

### Relief Requested

WHEREFORE, Plaintiffs respectfully requests:

1.      That this Court assume jurisdiction;

2.      That this Court declare the actions of Defendant described in this Complaint to be in violation of Titles III and IV of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

3.      That this Court enter an injunction ordering Defendant to cease discrimination on the basis of disability in the provision of services;

4.      That this Court award Plaintiffs compensatory damages under the Rehabilitation Act;

5.      That this Court award Plaintiffs their reasonable attorneys' fees and costs; and

6.      That this Court award such additional or alternative relief as may be just, proper and equitable.

JURY DEMAND:  Plaintiffs demand a jury for all claims properly tried to a jury.

Dated:   September 7, 2006          Respectfully submitted,

                                    COLORADO CROSS-DISABILITY COALITION


                                     s/ Carrie Ann Lucas

                                    Carrie Ann Lucas
                                      Equal Justice Works Fellow
                                    clucas@ccdconline.org
                                    Kevin W. Williams
                                      Legal Program Director
                                    kwilliams@ccdconline.org
                                    655 Broadway, Suite 775
                                    Denver, CO 80203
                                    303.839.1775 (voice)
                                    303.839.1782 (fax)

                                    Attorneys for Plaintiffs


Address of Plaintiff Colorado Cross-Disability Coalition, d/b/a Center for Rights of Parents with
Disabilities

655 Broadway, Suite 775
Denver, CO 80203

Address of Plaintiff Ginny Lockwood

16400 Umpire St.
Hudson, CO 80642

Address of Plaintiff Jennifer Ann Pfau

1319 W. 133rd Circle
Westminster, CO 80234

Address of Plaintiff Annette A. Guerrero

1614 Iris Street, # 97
Lakewood, CO 80215

Address of Plaintiff Manuel Olivas

1614 Iris Street, # 97
Lakewood, CO 80215